## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **Case No. 21-20060-JAR** |
| **KAABA MAJEED,**<br>**YUNUS RASSOUL,**<br>**JAMES STATON,**<br>    **a.k.a. ADAM WINTHROP,**<br>**RANDOLPH RODNEY HADLEY,**<br>**DANIEL AUBREY JENKINS, and**<br>**DANA PEACH,**<br>                **Defendants.** | |

## <u>SENTENCING MEMORANDUM</u>

The United States of America, through undersigned counsel, hereby submits its consolidated sentencing memorandum. For these reasons and as further explained below, the United States respectfully submits that sentences within the Sentencing Guidelines range for each defendant are appropriate under 18 U.S.C. § 3553(a).

## I.    Presentence Investigation Report and Sentencing Guidelines Calculations

On July 10, 2025, the U.S. Probation Office issued its final Presentence Investigation Reports (PSRs). It determined the applicable Guidelines sentence for Majeed as follows: 1,260 months of imprisonment for defendant Kaaba Majeed, based on an adjusted offense level of 43 and criminal history category of I.[1]

---

[1] A total offense level of 43 amounts to a sentence of life in prison. Because that is above the statutory maximum, Probation calculated Majeed's Guidelines sentence to be 1,260.

The PSRs calculate the Guidelines range for the other defendants, respectively, as follows: Rassoull – 324-405 months; Staton – 324-405 months; Hadley – 360 months-life, Peach – 324-405 months.   If USSG § 3B1.4 is applied, the total offense level would be increased by two levels (to 43) and the guidelines range for all of the defendants would be life.   However, the PSRs properly recommend 60-month Guidelines sentences based on the maximum statutory penalty imposed by 18 U.S.C. § 371.

The government submits that the advisory Sentencing Guideline ranges set forth in the PSRs are correct and respectfully requests that the Court adopt the PSRs' facts and Guidelines calculations.   The government incorporates the arguments set forth in its response to the defendants' PSR objections and does not repeat those arguments here.

Guideline sentences are warranted given the duration and nature of defendants' participation in the forced labor conspiracy, the number of victims whose labor they obtained by force and threats of serious harm, the length of time the defendants and their co-conspirators profited from the forced labor of their victims, and the lasting physical and mental harm they inflicted on their victims.

A Guidelines sentence is further appropriate given that the defendants' forced labor scheme lasted over a decade, with most victims exploited for many years.   This length of time is simply not recognized in the Guidelines, which provide for a 3-level increase for servitude over one year as to a single victim.   The total offense level would be considerably greater if this increase were applied on a victim-by-victim basis.

Finally, the Guidelines fail to take into account physical or psychological abuse that does not rise to the level of causing "serious bodily injury."   Numerous victims testified to witnessing

physical violence against other children or UNOI members who did not comply with Royall Jenkins's and the defendants' mandates.    Victims recounted multiple instances of psychological abuse which culminated in them believing that they lacked worth as human beings.    The victims still struggle with the impact of the defendants' abuse to this day.    The defendants' psychological abuse of their victims is an important element of the offense conduct and one which is not specifically reflected in the Guidelines.

## II.    **Statutory Factors Warrant Guidelines Sentences**

The Supreme Court has declared "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" of all sentences. *Gall v. United States*, 552 U.S. 38, 41 (2007).    Only after calculating the Guidelines should the sentencing court "determine whether a sentence within that [Guidelines] range serves the factors set forth in [18 U.S.C.] § 3553(a)."

Section 3553(a)(1) provides that, in determining the sentence, courts must consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).    Additional factors in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense and to promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other corrective treatment in the most effective manner.    18 U.S.C. § 3553(a)(2).

Therefore, under Supreme Court authority, a sentencing court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the

former with reference to the latter." *Nelson v. United States*, 555 U.S. 350, 351 (2009). When the Court, in consideration of the section 3553 factors, imposes a non-guideline sentence, it must give "serious consideration to the extent" of the deviation and provide an explanation to allow for meaningful appellate review and to promote the perception of fair sentencing. *Gall*, 552 U.S. at 46, 50.

Here, each defendants' conduct, considered in conjunction with the sentencing factors set forth in 18 U.S.C. § 3553(a), calls for a sentence within the applicable sentencing Guidelines range. Moreover, the Guidelines range reflecting Rassoull's, Staton's, Hadley's, Jenkins's, and Peach's offense conduct is six times the statutory maximum of 60 months' imprisonment. Had these defendants been charged with 18 U.S.C. § 1594(b) (which was enacted on December 23, 2008), the statutory maximum for conspiracy would be twenty years for the same conduct that Rassoull, Staton, Hadley, Jenkins, and Peach were convicted of in this case. A Guidelines sentence of 60 months is necessary to account for the nature and circumstances of their offense conduct, to the extent permissible.

### A.    Nature and Circumstances of the Offense

The defendants conspired and worked together to force children to work in UNOI businesses. The means by which the defendants forced the labor of their minor victims was particularly cruel, with repeated physical and psychological abuse that left the victims feeling they had no choice but to engage in the labor or face serious harm. The defendants did not provide UNOI child victims with educations or otherwise allow them to enroll in school; they deprived the victims of medical treatment; and they did not provide any normal aspects of childhood. The defendants instead put the children to work in UNOI restaurants and in their own homes. The

4

children cooked, cleaned, and cared for the defendants' children.    The defendants did not pay the children for their labor for the vast majority of their scheme and only a nominal amount at the very end.    And the defendants inflicted punishments on the children as part of their coercive scheme—physical and psychological abuse, as well as food deprivation and isolation.    The harm and exploitation lasted more than a decade.    The defendants each consistently participated and played a substantial role in the criminal conduct throughout the charged time period, and the "nature and circumstances of the offense" warrant Guidelines sentences.

### 1. Majeed

As a national figure in UNOI and eventual member of the board, Majeed had significant influence and authority for years.    Majeed rose through the ranks from local lieutenant up to Royall's second in command as National/Supreme Captain.    Witnesses described Majeed as Royall's "right hand man," who had authority to make and execute decisions without prior authorization from Royall.    Tr. 1806, 2353-54.    Majeed was also a member of the Royall Family through marriage to Royall's granddaughter.    Majeed PSR ¶ 26; Tr. 2356-57.    Eventually Majeed became Supreme Captain, where, in addition to the role he previously held as National Lieutenant, he oversaw the MGT, which was highly unusual and had never been done before.    Tr. 1105-06, 2355.    For example, Majeed told Stacy G. that she needed to do her wifely duties with her husband, which included consummating her marriage, which she did not want to do.    Tr. 2372. Majeed was also named a member of the board.    Tr. 581, 1105, 2362.    As such, he was in a unique position to stop the abuses, to tell members that Royall was not God and did not deserve their loyalty, and to end the forced labor of victims.    However, he chose not to do any of those things.    Indeed, the board decided what details they would tell members and what they would

withhold.    Tr. 4554-58, 4565-67, 4586.    And he, as a member of the board, continued to use Royall's language and rhetoric to run UNOI.    Tr. 4554-58.

Majeed also routinely threatened and hit children.    Tr. 883, 1125-26, 1781-82, 1835, 1996, 4961-64.    He was described as one of the harshest punishers and that he seemed to enjoy it.    Tr. 2001-04.    Majeed was also involved in keeping Wilma M.'s children from her.    Tr. 2367-68. He made decisions about where children would be dispatched to work.    Tr.    1108-09, 2248-49. While in charge of the New York and New Jersey restaurants, Majeed told children to lie about their ages and why they were working in the restaurants.    Tr. 1091-92, 1442-43, 2032-2033, 2778-80.    Majeed himself also lied to the New York Department Labor about what children were doing at the restaurant and attempted to hide child employees.    Tr. 2177, 2782-83.    Later, when Niesha K. talked to Majeed about wanting to attend college, Majeed laughed at her, told her she was stupid, and acknowledged that her UNOI education would not count because it was not accredited. Tr. 2790.

Unlike the victims who escaped UNOI with only the clothes on their backs, when Majeed left UNOI—or rather, when UNOI ceased to exist—he kept the BioCoffee business, which was built on the backs of the victims, for himself and used it to become a successful business owner and millionaire.    Tr. 1471-72, 1806, 2358-61, 3106, 3978-81; Majeed PSR ¶ 222, 224; Exhibit A. Meanwhile the victims struggled to get GEDs, find jobs, and survive in the outside world.

## 2. *Rassoull*

Rassoull was raised in UNOI; and his parents were active members with preferred status in the organization.    Rassoull eventually married Royall's granddaughter, Mariah K., and was considered adopted Royall Family.    At 14 years old, Royall selected Rassoull to become a

minister in recognition of Rassoull's advanced talent in preaching and teaching the UNOI ideology. Over the years Rassoul rose in rank to National Minister, meaning all temple ministers reported to him.   Also, in earlier years, Rassoull performed hands-on duties in UNOI, including managing the bakery in Kansas City, heading the local temple in Connecticut, and being in charge of the temples and businesses in Connecticut and Rhode Island.

As National Minister, Rassoull was responsible for teaching and spreading Royall's religious rhetoric, which was filled with ideas and principles built on fear and designed to control members of UNOI.   In that regard, Rassoull was second only to Royall.   Rassoull taught that members must provide free labor as part of their "duty" to UNOI and Royall, who he claimed was Allah, and that their continued faithful membership in UNOI was their ticket to salvation instead of hellfire and death.   And even when Rassoull learned that Royall was a fraud and UNOI and many of the foundational beliefs were "poison," Rassoull continued to espouse, promote, and use those fear- and control-based principles, not to dismantle the organization, but to grow it.   Tr. 4460, 4554-58, 4577-78, 4581.   As a national figure and member of the board, he was uniquely positioned to stop the victimization of children, and he chose not to.    This is in direct contrast to Elijah M. who, while a lieutenant for a brief time, intervened in and reported to Royall that Hadley physically beat an elderly man, because Elijah M. recognized it was wrong.   *Id.* at 1097-1100. As a result, Elijah M. was demoted and chastised.   *Id.* at 1100.   Also, as part of his role as National Minister, Rassoull participated in calls regarding disciplining and dispatching children. He oversaw the Connecticut temple, where he found housing for members, collected money from the businesses, and was the point person for anything that needed to or did happen in Connecticut, including overseeing victims who worked in the bakery.   *Id.* at 4535.   Rassoull also threatened

7

Wilma M. in a conference call after she sought to get her kidnapped children back, saying "Why does she want her children returned to her so they can watch her be destroyed?" Tr. 3192.

### 3. Staton

As a national figure in UNOI, Staton presided over many parts of the organization for years. First and foremost, Staton was the National Secretary.    Staton PSR ¶ 28. UNOI was primarily a collection of businesses disguised as a religious institution.    At all times, the organization's primary purpose was to make money through unpaid, coerced labor of defenseless children.    As the head manager of UNOI's businesses, finances, and membership, *see id.*, Staton was actively involved in carrying out UNOI's true purpose.    Indeed, at trial, the jury learned about UNOI's Laborers' Guide, *see* Ex. 302, which Staton created to codify UNOI's culture of control, fear, and subservience of its members.    Of note, the Laborers' Guide set forth the "Proper Treatment of the Royall Family," of which Staton was a member. *See id.* at 2-3. The Guide instructed members to have a "submissive posture," to turn their backs on the Royall Family "only with permission," and to "[a]lways be on the alert for possible needs of the Royall Family." *Id.* The Guide further informed members that "[m]istakes shall not exist among the Laborers." *Id.* Staton also created the UNOI Instructor Notebook, which set forth the University's disciplinary protocols for children. *See* Ex. 307. Although Staton claims he was not involved in what happened at the University, his creation of the University's disciplinary handbook says otherwise.    For example, Staton wrote in the Instructor Notebook that officials at the University should physically abuse children for infractions, including by paddling them and "popping" them in the mouth. *See id.* at 14-15. That included, at times, children under 7 years old.    Viewing these dictates alongside the tasks that child members were actually performing—working in restaurants and other businesses all day for

no pay—it is clear that Staton was an architect of the organization's culture of coerced child labor. Staton's other chief role was to preside over "math class."    Staton PSR ¶ 28. In that role, Staton kept members, including children, in line and made sure their infractions were met with swift punishment, including starving children through fasting, administering beatings, and ridiculing and shaming children.    Perhaps most significantly, Staton and others in leadership made members think that if they did not do as told, they would burn in hell for eternity.    Indeed, the "Disciplinary Classes" that Staton memorialized in the Laborers' Guide noted that the most severe punishment was "Class F – The Fire."    Ex. 302 at 12-13. It is important to note that these punishments did not occur in isolation.    After school and after math class, these children did not forget what Staton and other officials did and said to them when they went to work in UNOI's businesses.    Those punishments and that culture of obedience and subservience did not leave them when they went to the bakery to make pies, or when they went to the restaurant to bus tables.    It stayed with them and compelled them to work against their will.    And Staton was a creator and overseer of that abusive, coercive scheme.    Some other examples of the nature and circumstances of the offense include:

- Staton paddled Devon Y. and ordered him to fast for wetting the bed.    Tr. 886.

- Staton withheld Niesha K.'s inhaler during a severe asthma attack and called her demon possessed.    Staton PSR ¶ 61.

- Staton routinely threatened members in math class that they would not make it on the spaceship, the implication being that they would therefore burn in hell.    *Id.*

- Staton controlled UNOI's main phone line, on which he monitored calls between child members and their families and spoke to disaffected members.    Tr. 892.

- Staton told Tranquest W. that by leaving UNOI, she was putting herself in a position to be killed.   Staton also told her that she was too young, had no money to survive, and that she only wanted to leave because she did not want to do her discipline.   Staton PSR ¶ 123.

- Staton interfaced with the public to falsely portray UNOI as a beacon of hope for the Black community.

- Staton received the benefit of live-in laborers, including minors Devon Y., Niesha K., Nicolette K., and Shakira M., who testified that Staton summoned her using an intercom. Tr. 2638.

### 4. Hadley

Hadley was widely known throughout UNOI as an enforcer who maintained order and control over the victims.   He had a reputation for violence.   One victim described Hadley and Majeed as the harshest when it came to punishment—he said that both seemed to enjoy it, as their "first instinct was to hurt" the children.   Tr. 1992, 2001-04; Hadley PSR ¶ 111.   This was reflected in the many accounts of physical violence on Hadley's part.   To highlight just a few:

- Hadley forced two children, one thirteen years old, to put their hands on a table inside the boiler room while he struck them once for every year they had been alive.   When they were not able to keep their hands on the table, Hadley started over.   One victim said he was taken to the diner and worked a full shift after the beating—the victim had trouble sitting and sleeping for a week.   The witness said it felt as though Hadley used "all his might to hit" him and "lacked empathy."   Tr. 985-89, 1016.

- On a "camping trip from hell," victims described hearing screams from the woods where Hadley "whooped" them.   *Id.* at 1469; 2731-32.   Hadley forced one thirteen- or

fourteen-year-old girl to lower her pants and underwear and struck her with a paddle twenty times.   *Id.* at 2736-37.   The victim said that Hadley would "brag about [the beatings] and laugh afterwards and use it as threats to let other people know what he was going to do next.   He definitely set that tone when he would brag about it and laugh and while the person is sitting there that he just got done beating up."   *Id.* at 2740.

- Hadley and Aubrey Jenkins held a victim over train tracks for stealing a salmon sandwich when he was hungry from being forced to fast.   *Id.* at 880-82.

- In the presence of other victims, Hadley and another official took a child into a room and when he came out, he was unrecognizable, with a severely beaten face and eyes nearly swollen shut.   Hadley PSR ¶¶ 61, 104, 111; Tr. 3282-83.

- Hadley imposed "FOI beatdowns," in which UNOI members were physically abused for infractions.   Tr. 1124-32.

In addition to his penchant for violence, Hadley was a leading official who had authority to make decisions independently.   Hadley PSR ¶ 28.   He participated in NFL draft-style calls regarding dispatching victims across the country to work in UNOI businesses and was on calls with national ministers, including Majeed and Peach.   Tr. 510, 1108-09.   He taught math class. *Id.* at 1045.   As a result, Hadley enjoyed special privileges others did not.   He had live-in help for childcare, cooking, and cleaning.   Hadley PSR ¶¶ 28, 36, 116.   In one instance, Hadley and his wife inspected a 15-year-old victim's body and told her that she looked good.   *Id.* ¶ 73; Tr. 3319-21.   Hadley's version of his conduct, as evidenced by his objections to the PSR, is simply unsupported by the facts.

   *5.   Aubrey*

At his most powerful, Aubrey was a Captain and head of FOI in UNOI. Aubrey PSR ¶ 30. In that role, he enforced UNOI's strict rules, including by exercising power and control over children, and sometimes physically abusing them. Witnesses characterized Aubrey as imposing severe discipline. For example, Aubrey held Devon Y.—a child at the time—over a bridge, threatening to drop him on train tracks below. Tr. 880-82. Aubrey ordered and imposed beatdowns and chest cavities of multiple members, including Elijah M. Aubrey PSR ¶ 63. In that role, Aubrey helped instill fear into child members. Aubrey also played an active role in starting new UNOI businesses and helping to grow the enterprise. Aubrey PSR ¶ 30. Aubrey enjoyed privileged status in UNOI because he was Royall's grandson. *Id.* That privileged status also allowed Aubrey to have multiple wives in the organization. In fact, he married Doneika D. when he was 20 or 21 years old, and she was 15 or 16 years old. Aubrey PSR ¶ 19. They had a child together. Tr. 1626-27.

### 6. *Peach*

Peach was one of Royall Jenkins's wives, and in that role, she had considerable power and influence in UNOI. Peach had power over local officials, and some national officials. Peach PSR ¶ 30. She participated in calls with national ministers to discuss UNOI business. Tr. 510-11. She taught math class. *Id.* at 1746. She worked in the Secretarial Department and was one of the few people allowed to handle the money. Peach PSR ¶¶ 30, 134; Tr. 512. She supervised various members, including minor victims, in Cincinnati, Maryland, Kansas City, and New Jersey. Peach PSR ¶ 63; Tr. 542-43, 3412-15, 4861.

Peach physically disciplined many of the minor victims. Peach PSR ¶¶ 63, 134; Tr. 1753, 1757. She even laughed about how the children would react when being physically disciplined.

Tr. 552.    Tyneemah J. described how Peach paddled her, slapped her, put her on fasts, and Class A on many occasions.    Peach once paddled her ten times for drinking from the toilet when she was thirsty after being deprived of water.    Peach PSR ¶ 63; Tr. 1749-51, 1786-88.    Peach also disciplined Tyneemah for having a seizure by forcing her to drink bloodroot and making her stay in the boiler room.    Tr. 1763.    Tyneemah described witnessing other children "having the walk" after being paddled.    *Id.* at 1749-1751, 1757.    Stacey G. testified that Peach paddled her 18 times.    Peach PSR ¶ 63; Tr. 3411.    Peach physically punished Amira K.    Peach PSR ¶ 63; Tr. 455-56.    In her role as a "doctor," Peach used a "hot box" sauna and administered colonics as punishment.    Peach PSR ¶¶ 41, 63; Tr. 1760-61, 1797-98.

Peach had female minor victims who worked in her home, cooking, cleaning, and providing childcare.    Peach PSR ¶¶ 36, 68; Tr. 496, 559.    She was nurturing toward her own children, compared to the way she treated other female youth.    Tr. 1799-1800.    As a wife and leading official, Peach enjoyed privileges, freedom, and autonomy that were not given to other members. *Id.* at 416-17, 1115, 1118-19.

### B.    History and Characteristics of the Defendants

Overall, the defendants' personal characteristics support a Guidelines range sentence and do not establish any extraordinary circumstances warranting a downward departure or variance from the applicable Guidelines range.    The PSRs do not reveal anything remarkable about the defendants' backgrounds that explains or mitigates the serious offense conduct.

The defendants did not commit this offense in a momentary heat of passion.    Their crime was not the result of a bad decision made in an instant.    Rather, this offense occurred every day for more than a decade in a cold and calculated manner.    To do so successfully required the

defendants and their co-conspirators to view the minor victims as property; to treat them differently than their own children; and to inflict severe physical and psychological abuse on them.

    *1.  Majeed*

    Majeed is 51 and without a criminal record.    However, Majeed was convicted of a crime that spanned over twelve years.    Thus, for most of his adult life, Majeed was engaged in a scheme to commit forced labor against children.    He does not report a history of mental or emotional health concerns or substance abuse issues.    Indeed, he grew up in a supportive environment where he was afforded ample opportunity to build a stable family life and attend college.    His background and education, in part, allowed him to easily move up in status within UNOI, where he gained Royall's trust and respect.    Majeed also, by his own admission, took it upon himself to correct people of higher status or title, which was noticed by Royall and propelled Majeed to the top.    Tr. 4664-66.    Additionally, Majeed's parents were some of the biggest financial donors for UNOI, and as a result, they were treated differently.    Tr. 2351.    Majeed held many positions of authority within the nation, ultimately being named Supreme Captain and a member of the board. Tr. 1103-05; 4665; 4711.    Upon leaving UNOI, Majeed took Biocoffee for himself and ran that business through 2024.    Tr. 1471-72, 1806, 2358-61, 3106, 3978-81, Majeed PSR ¶ 222, Exhibit A.    Majeed has now amassed a total net worth of over two million dollars.    Majeed PSR ¶ 224. Finally, Majeed has shown a complete lack of remorse and acceptance of responsibility.    At trial Majeed testified, "I took pride in everything I did in The Nation."    Later, even after his conviction, in his interview with probation, Majeed stated that he took pride in "shutting the whole thing down" and noted that he had moral standards in doing right.    Majeed PSR ¶ 213.

    *2.  Rassoull*

While Rassoull is 39 years old and does not have a criminal history, the crime for which he was convicted took place over the course of twelve years. Thus, most of his adult life was spent engaged in this conspiracy to commit forced labor against children. While Rassoull joined UNOI as a child, he was not similarly situated to the victims. He was treated as special by Royall Jenkins. At age 14, Rassoull was made a minister. Tr. 4305-06, 4309. At 16 or 17 years old, he got a driver's license. *Id.* at 4310. His testimony about his own childhood experience was vastly different than the victims' testimony about their experiences in UNOI. For example, Rassoull testified that while the work on the farm in Maryland was hard, the interaction between people on the farm was "actually pretty fun." *Id.* at 4272-73. He went so far as to say that people generally had fun doing the work. *Id.* at 4495. Rassoull also suggested that the barracks above the donut shop had been renovated and were in decent shape. *Id.* at 4282-83. Again, this directly contradicts the testimony of witnesses who described it as run down with mice or rats present. *Id.* at 974-75, 3920. Even Rassoull's description of being paddled directly contradicted the testimony of several other witnesses about the boiler room where paddling took place and the severity of the paddling victims received. *Id.* at 4301-02. Indeed, Rassoull also attempted to avoid responsibility for his crime by falsely portraying most aspects of UNOI as something that was good, rather than acknowledging that it was bad for all of the children involved. Importantly, Rassoull's testimony was not only contradicted by other victims' and witnesses' trial testimony, but also by his own admissions. At trial and in his sworn affidavit submitted to the Court at the motions hearing conducted June 26, 2024, Rassoull indicated that he moved into his home in Florida in 2011. *Id.* at 4478-79, Ex. B. These statements were made when the Court and the jury were making decisions about statute of limitations and withdrawal from the conspiracy. In

15

the PSR, when those issues were no longer pertinent, Rassoull finally admitted that he and his wife at the time, Mariah K., did not move to Florida until 2013.    Rassoull PSR ¶ 173.

Rassoull was also uniquely situated in that he had access to and read books that were not approved by Royall.    Tr. 4317-18, 4341-42.    Therefore, he gained wisdom and knowledge not afforded to other members, especially those who were born into or joined UNOI as young children. Further, unlike regular full-time members, Rassoull held an outside job and spent that money on his own family.    *Id.* at 4368-69; 4535-36.    As such, he had the opportunity to learn about and participate in a world outside of UNOI.    After the end of UNOI, Rassoull was successful in business, including as a kitchen and district manager of restaurants and now as a director of construction where he makes $8,457.00 per month and has amassed a net worth of over $600,000. Rassoull PSR ¶ 182.    The defendant's position since leaving UNOI stands in stark contrast to the minor victims.    For them, the decade or more they spent in UNOI amounted to lost years, the trauma of which was still evident during their testimony at trial.

### 3.  Staton

Staton is 62 years old and does not have a criminal record.    While Staton may point out his lack of criminal history, he did not live a life free of crime.    The crime for which he was convicted took place over the course of twelve years.    Indeed, Staton spent much of his adult life engaged in this conspiracy to commit forced labor against defenseless children.    He moved to Kansas City in 1996 and was instrumental in building UNOI into a vast organization with businesses around the country.    Staton PSR ¶ 173.    Most witnesses testified that the abuse towards children was worse in the early days of UNOI, a time when Staton's influence was at its highest.    Staton has also shown a complete lack of remorse and acceptance of responsibility.    In

his filings following the verdict, Staton has continued to deflect responsibility onto Royall and claim that he was a true believer of the tenets of UNOI.   He has further continued to claim that UNOI was meant to help its members.   But as the evidence proved, it was clear from the beginning that UNOI was premised on ideas of dominance, control, exploitation, and abuse; and Staton was instrumental in making those ideas a reality for so many defenseless children in UNOI.

4.  *Hadley*

Hadley's privileged life indicates all the more that a Guidelines sentence is appropriate. He does not report a history of mental or emotional health concerns or substance abuse issues. Indeed, he grew up in a supportive environment where he was afforded ample opportunity to build a stable family life and obtain a college degree.   Hadley PSR ¶¶ 173, 176.

Hadley then joined UNOI as a college-educated adult.   Near the end of his time in UNOI, he had the financial resources and was apparently free to pursue a master's degree in Aviation Management.   *Id.* ¶ 185.   He parlayed that into a series of high-level jobs at the Atlanta International Airport.   *Id.* ¶ 186.   He now has a million-dollar real estate portfolio.   *Id.* ¶ 188.

The defendant's position entering and leaving UNOI stands in stark contrast to the minor victims.   For them, the decade or more they spent in UNOI were lost years, the trauma of which was evident during their testimony at trial.

Hadley also has prior criminal offenses involving the possession or use of firearms.   In one instance, he shot a firearm at a ceiling as part of a gambling dispute.   *Id.* ¶¶ 165, 167.   Of course, in addition to this criminal history, he was convicted of the forced labor conspiracy with which he was integrally involved for more than a decade.

5. *Aubrey*

Aubrey was an enforcer in UNOI in its earlier years.    In that role, he imposed punishments and physically abused children during a time in UNOI's history when it was particularly abusive. This includes when Aubrey held Devon Y. off the side of a bridge for stealing a salmon sandwich. It is important to note that while Aubrey left UNOI for a period starting around 2008 or 2009, he did not leave of his own volition; rather, he was ousted by Royall.    *See* ECF No. 586 at 10. Moreover, Aubrey did not leave UNOI and then lead a law-abiding life.    To the contrary, immediately following Aubrey's departure from UNOI, he was arrested twice for selling drugs, once in July 2008 and again in February 2009.    Aubrey PSR ¶¶ 162-78. Aubrey was convicted of both felony offenses and sentenced in September 2009, after which he absconded for three years while on probation.    *Id.*    When Aubrey was found in 2013, he finished out his prison sentence for the following three years and was released in 2016.    *Id.*    Following that, Aubrey was arrested and convicted of driving under the influence in 2020, and he completed a diversion program.    *Id.* Based on Aubrey's criminal conduct, he has a criminal history category of III, bringing his Guidelines range to 360-life.    Additionally, during the time following the dissolution of UNOI in 2012, Aubrey worked with his grandfather, Royall, to essentially create new versions of UNOI. Amira K. testified that she last saw Aubrey in 2014 when he was accompanying Royall on a trip to North Carolina where Aubrey and Royall were pitching two new organizations, Value Creators and Promise Keepers, to former UNOI officials.    Aubrey PSR ¶ 30.    In 2019, Kendra R.'s civil lawyer deposed Aubrey, and he testified that after he got out of prison in 2016, he went to Maryland and helped in "getting things going" for Value Creators in Maryland, Connecticut, and Atlanta. Ex. C, Tr. 3.    He also testified that he participated in all Value Creators businesses, offering the

"knowledge" he acquired from UNOI, Ex. C, Tr. 4, and that Royall got him a car to drive and a home in which to live.    Ex. C, Tr. 5.    Value Creators even paid Aubrey's $300 per month child support, Ex. C, Tr. 2, and Aubrey drove a Chevrolet Tahoe titled to Dana Peach, who was also involved with Value Creators.    Ex. C, Tr. 6.    Aubrey clearly did not have any misgivings about his earlier role in the conspiracy to commit forced labor at UNOI, because he essentially did the same thing all over again with Royall after UNOI ceased to exist.

### 6.  Peach

Peach does not report a history of mental or emotional health concerns or substance abuse issues.    She came from a home free from abuse and neglect and was able to obtain a high school degree.    Peach PSR ¶¶ 171, 180.    She joined UNOI as an adult, after having spent many years working at government agencies in Washington, DC.    *Id.* ¶ 181.

The defendant's position entering and leaving UNOI stands in stark contrast to the minor victims.    For them, the decade or more they spent in UNOI were lost years, the trauma of which was evident during their testimony at trial.    Peach, on the other hand, went on to participate in another version of UNOI along with Royall and Aubrey.

While Peach does not have a criminal history, the crime for which she was convicted took place over the course of twelve years.    Thus, much of her adult life was spent engaged in this conspiracy to commit forced labor against children.    Like Aubrey, Kendra R.'s civil lawyers deposed Peach in their effort to find UNOI's assets to satisfy Kendra's civil judgment. Despite being under oath, Peach was obstructive and lied throughout her deposition. For example, Kendra's lawyer asked if Peach had ever been married to Royall, either legally or in a religious capacity, and Peach said no. Ex. D Tr. 2-3. This, of course, is patently false as shown during the entire trial.

Peach also lied and said she did not make any regular payments aside from her rent and phone bill. She denied owning a Chevrolet Tahoe but later admitted she had a Tahoe titled in her name, and that the Promise Keepers made payments on that car. When asked if Aubrey was driving around in her Tahoe, and she said "no – he's not driving around in that Tahoe, no." Ex. D Tr. 9-14. The following week, Aubrey admitted in his deposition that he drove Peach's Tahoe to the deposition. Peach was also asked when she last spoke to Aubrey, and she said, "over a year ago." Later, she admitted to being at the same hearing as Aubrey a month earlier in Kansas. Ex. D. 4-8. Peach's obstructive and untruthful testimony in her deposition shows that she has not taken any sort of responsibility for her criminal conduct. Moreover, it shows a callous effort to avoid responsibility through false testimony.

### C. Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Provide Just Punishment, and Afford Adequate Deterrence

The defendants' conduct, as set out in greater detail in the PSR, demonstrates the seriousness of their offenses. Their criminal conspiracy was designed to dehumanize and force children to work in UNOI businesses and officials' homes. The seriousness of the defendants' coercive conduct was made worse by the fact that the victims—the children—were in their care. They were entrusted to the defendants, and the defendants did not just put the children to work; they robbed them of their families and childhoods. The severity of the labor the defendants conspired to force minor victims to perform was matched by the seriousness of their coercive scheme. They furthered their criminal conspiracy with physical abuse, psychological manipulation, isolation, and food deprivation. The victims' testimony vividly illustrated the extent to which the defendants had, over years of abuse and threats of serious harm, left their victims believing that they had nothing—and were nothing—without UNOI.

20

The defendants violated a fundamental and foundational right afforded people in the United States—the Thirteenth Amendment's guarantee that no person shall be subject to compelled servitude.    U.S. CONST. amend. XIII, § 1.    The defendants violated that fundamental right afforded to minor children every day for more than a decade, using a multitude of coercive measures.

The work that the defendants compelled minor victims to perform was extreme and relentless.    The defendants compelled the victims to work nearly every day for long hours and with limited breaks, sometimes while being deprived of food.    Some victims then had to go home to the defendants' and other UNOI officials' home to take care of children, cook, and clean, only to wake up and go to work again the following day while sleep deprived and hungry.    The Guidelines account for a single victim being held in a condition of involuntary servitude for more than one year, *see* USSG § 2H4.1(b)(3), but, here, the defendants made numerous minor victims work for years.    This duration of labor warrants Guidelines sentences.

Furthermore, a Guidelines sentence would afford necessary general deterrence by deterring others inclined to engage in similar offenses.    The defendants' forced labor conspiracy was not a crime of passion—it was coordinated and calculated over a period of multiple years to maximize their profits at the expense of minor children—and general deterrence is more apt in cases where the crime is calculated and financially motivated.    *See United States v. Howard*, 28 F.4th 180, 208-09 (11th Cir. 2022) (describing, in the context of a financial crime, how "[g]eneral deterrence is more apt, not less apt, in white collar crime cases" because "'economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity,' which makes

21

them 'prime candidates for general deterrence'" (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013))).

## III.    Restitution

The government's position on restitution is detailed in the PSRs.   PSR ¶¶ 143a-143h. The liquidated damages are mandatory as part of restitution orders under the TVPA, which are not a penalty, but "rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA."   *United States v. Sabhnani*, 599 F.3d 215, 259-60 (2d Cir. 2010); *see also United States v. Edwards*, 995 F.3d 342, 346-47 (4th Cir.2021) (holding that an employer that "fails to comply" with sections 206 and 207 must pay *both* unpaid wages and overtime compensation *and* "liquidated damages of an amount equal to the unpaid wages and overtime compensation").   At sentencing, the government will offer interview reports as exhibits for any victims who did not testify at trial, which consist of the bottom third of the witnesses in the chart in ¶ 143h.

The Court, in determining the appropriate amount of restitution, "may consider hearsay evidence that bears a minimal indicia of reliability so long as the defendant is given an opportunity to refute the evidence."   *United States v. Howard*, 784 F.3d 745, 750 (10th Cir. 2015) (quoting *United States v. Rodriquez*, 751 F.3d 1244, 1261 (11th Cir. 2014) (internal quotation marks omitted)).   Further, the amount of loss need not be determined with absolute precision.   "The court need not calculate the harms with exact precision, but it must set a restitution amount that is 'rooted in a calculation of actual loss.'"   *United States v. Anthony*, 942 F.3d 955, 970 (10th Cir. 2019) (quoting *United States v. Ferdman*, 779 F.3d 1129, 1133 (10th Cir. 2015)); *see also United States v. Gallant*, 537 F.3d 1202, 1252 (10th Cir. 2008) (explaining the court need only make a

reasonable determination of appropriate restitution).    Courts acknowledge that the determination

of an appropriate restitution amount is by nature an inexact science.    *See United States v. Teehee*,

893 F.2d 271, 274 (10th Cir. 1990).    Even in those cases where the precise amount owed is

difficult to determine, a court's authority to deny restitution is limited.    *Id.*    Section 3664(d)

authorizes the Court to reach an expeditious, reasonable determination of appropriate restitution

by resolving uncertainties with a view toward achieving fairness to the victim.    *Id.*; *see also*

S.Rep. No. 532, 97th Cong., 2d Sess. 31, reprinted in 1982 U.S.Code Cong. & Admin.News 2515,

2537.    "Any dispute as to the proper amount . . . of restitution shall be resolved by the court by

the preponderance of the evidence."    18 U.S.C. § 3664(e).    "A district court 'may resolve

restitution uncertainties with a view towards achieving fairness to the victim so long as it still

makes a reasonable determination of appropriate restitution rooted in a calculation of actual loss.'"

*United States v. Dickerson*, 678 Fed. App'x 706, 722 (10th Cir. 2017) (quoting *Ferdman*, 779 F.3d

at 1133); *see also Gallant*, 537 F.3d at 1252.

　　　　Based on the foregoing the Court should order restitution based on the losses the victims

suffered as a result of all defendants' conduct.

## IV.    Conclusion

　　　　For the foregoing reasons, the United States respectfully requests that this Court impose

sentences within the Guidelines range as calculated in the PSRs. Such sentences are sufficient, but

not greater than necessary to satisfy the purpose of sentencing set forth in 18 U.S.C. § 3553.

　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　DUSTON J. SLINKARD
　　　　　　　　　　　ACTING UNITED STATES ATTORNEY

By: */s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Phone:  913-551-6730
Fax:  913-551-6754
Email:  Ryan.Huschka@usdoj.gov
KS Bar No. 23840


HARMEET K. DHILLON
ASSISTANT ATTORNEY GENERAL

By: */s/ Kate A. Alexander*
Kate A. Alexander
Trial Attorney
USDOJ Human Trafficking Prosecution Unit
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:  202-532-3373
Email:  Kate.Alexander@usdoj.gov
FL Bar No. 27393

By: */s/ Francisco Zornosa*
Francisco Zornosa
Trial Attorney
USDOJ Human Trafficking Prosecution Unit
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:  202-616-4588
Email:  Francisco.Zornosa@usdoj.gov
NY Bar No. 5477245

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2025, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record in the above-captioned case.

<u>/s/ Kate A. Alexander</u>
KATE A. ALEXANDER
Trial Attorney

25