**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **Case No. 21-20060-JAR** |
| **KAABA MAJEED,** | |
| **YUNUS RASSOUL,** | |
| **JAMES STATON,** | |
| **a.k.a. ADAM WINTHROP,** | |
| **RANDOLPH RODNEY HADLEY,** | |
| **DANIEL AUBREY JENKINS, and** | |
| **DANA PEACH,** | |
| **Defendants.** | |

<u>**GOVERNMENT'S RESPONSE TO DEFENDANTS' SENTENCING MEMORANDA**</u>

The United States of America, through undersigned counsel, hereby submits its response to defendants' sentencing memoranda.[1]   The United States respectfully submits that sentences within the Sentencing Guidelines range for each defendant are appropriate under 18 U.S.C. § 3553(a).   With respect to Majeed, the government will make an ultimate recommendation regarding a term of imprisonment at the sentencing hearing.

Defendants, at trial, repeatedly attempted to portray UNOI as the organization that Royall claimed it to be—an organization for the betterment of the African American community.   They labeled the victims as liars and argued that their consistent claims of widespread abuses were false. Defendants denied that physical abuse existed, that children were forced to fast, that colonics were

---

[1]  Defendant Aubrey Jenkins did not file a sentencing memorandum.

used as punishment, and generally that anyone was forced to do anything in the Nation.    Now, defendants seek to benefit from the very evidence they claimed did not exist by arguing that they themselves were victims of Royall Jenkins.    They now attempt to align themselves with the victims they disparaged during trial and suggest that they are similarly situated.    They are not.

I.    **The Court Should Not Depart or Vary from the Sentencing Guidelines**

In deciding whether to depart from the applicable Guidelines sentencing range, the Court must employ the four-prong analysis that the Tenth Circuit enumerated in *United States v. Collins*, 122 F.3d 1297 (10th Cir. 1997), which, as the Tenth Circuit stated in *United States v. Jones*, 332 F.3d 1294 (10th Cir. 2003), Congress has superseded by statute:

> (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure, (3) whether the record sufficiently supports the factual basis underlying the departure, and (4) whether the degree of departure is reasonable.

*Collins,* 122 F.3d at 1303.    "The Tenth Circuit articulated that '[i]mpermissible factors include forbidden factors, discouraged factors that are not present to some exceptional degree, and encouraged factors already taken into account by the applicable guideline that are not present to some exceptional degree."    *Id.*    Thus, where the Guidelines classify the factors as encouraged or discouraged or do not mention the factor, the Court must engage in further analysis.    *United States v. Palma*, 376 F. Supp. 2d 1203, 1211 (D. New Mexico) (citing *United States v. Rybicki*, 96 F.3d 754, 758 (4th Cir. 1996) (holding that defendant's responsibilities to son and wife, both of whom have medical problems, are discouraged as a basis for downward departure).    Upon analysis, only if the Court determines that the circumstances and consequences of a case are atypical or unusual, and, therefore, the case does not fall within the Guidelines heartland, may it exercise discretion to

depart from the specified sentencing range.   *Id.*; *see also Koon v. United States*, 518 U.S. 81 (1996).   As discussed below, none of the circumstances or consequences of this case fall outside the Guidelines heartland, and even if the Court disagrees, departure or variance from Guidelines sentences in this case is not warranted.

### A.   U.S.S.G § 5K2.12 – Coercion and Duress

Rassoull, Hadley, and Peach ask the Court to depart from their Guidelines range because they claim that they, like the victims, were coerced.   The Tenth Circuit has concluded that coercion in the absence of evidence of such enumerated serious threats is a discouraged basis for departure.   *See United States v. Contreras*, 180 F.3d 1204, 1211 (10th Cir. 1999).

The legal standard for coercion under United States Sentencing Guidelines (U.S.S.G) § 5K2.12 is different—and a higher burden—than the legal standard for coercion in the context of their forced labor conspiracy convictions.   U.S.S.G. § 5K2.12 provides: "Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency.   Notwithstanding this policy statement, personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure."   The defendants in their sentencing memoranda claim that their conduct warrants leniency—and thus, a Guidelines departure—because they acted pursuant to the psychological pressures and control of Royall and UNOI more generally.   However, such pressures, assuming they even existed for the defendants, do not amount to a threat of physical injury, substantial damage to property, or similar injury resulting from the unlawful action of a third party.   Nothing in the record suggests that the defendants faced such threats; to the contrary, the defendants were

the threat makers.    And importantly, they were adults who carried out their scheme against children.

### 1. *Rassoull*

Rassoull argues that any acts he committed were out of coercion and duress.    The trial evidence belies this argument.    He states that Royall assigned members, including Rassoull, to spread his gospel and teachings, which included threats of harm or injury.    However, there was ample evidence at trial that Rassoull did not fear such harm or injury, because he acted outside of Royall's teachings and beliefs.    First, trial testimony, including Rassoull's own testimony, generally indicated that Rassoull wanted to spread Royall's message.    Even after Rassoull became a member of the board and purportedly learned that Royall was a fraud, he continued to use and spread parts of Royall's teachings.    Tr. 4554-55, 4557-58.    Indeed, the Tenth Circuit has noted that, "everyone has the obligation to cease criminal activity once the coercion subsides. Moreover, no one can rely on the fact that he or she was coerced when young to continue indefinitely in criminal activity without legal consequence."    *United States v. Contreras*, 180 F.3d 1204, 1212 (10th Cir. 1999).    After Rassoull became a member of the board and realized that Royall was not God and the foundational tenants of UNOI were based on lies, he (1) was no longer youthful at age 26, as addressed more fully below, and (2) the coercion had subsided (if it ever existed).

Further, Rassoull obtained an outside job preaching traditional Islam (not Royall's rhetoric) in prisons and halfway houses.    Tr. 4368-69, 4551.    This evidence rebuts Rassoull's assertion that he acted out of coercion and duress.    First, having a job outside of UNOI was forbidden for full-time members.    This means Rassoull knew the rules and nonetheless acted in opposition to

4

those rules, which is the opposite of coercion and duress.    Second, Royall did not know about this job, which refutes Rassoull's claim that he was preaching because "refusing to do so was not an option."    (Doc. 622, p. 49).    Rassoull also broke the rules by reading materials not approved by Royall.    Tr. 4318, 4342.    In fact, at trial Rassoull testified that he mostly read religious material outside of what was approved by Royall, because he felt that it needed to happen.    Tr. 4342.    Again, Rassoull made the conscious choice to break the rules, because he believed it was necessary to properly do his job as a minister.    This is direct evidence that Rassoull did not act out of coercion or duress or fear of consequences but out of his own desire to do the job as he saw fit.    Finally, Rassoull never testified that he acted in any way under threat of physical injury.    The trial record is devoid of such evidence and replete with evidence to the contrary.

### 2. *Hadley*

Hadley points to no evidence that proves he acted under threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party. He merely suggests he was more similarly situated to the victims than his co-conspirators.    Such evidence is insufficient to prove he acted under coercion or duress and is refuted by the testimony at trial.

### 3. *Peach*

Peach makes inconsistent arguments, claiming on the one hand that she was coerced, while on the other hand that she should get credit for her apparent acts of "defiance" against UNOI's harsh culture and refusal to "follow orders blindly."    Above all, these inconsistencies demonstrate a trend among all defendants to twist logic to avoid any responsibility for the role they played in victimizing countless children in UNOI.    The truth is that Peach, an adult member of the Royall

Family who wielded power in the organization, consciously carried out her role in the conspiracy and did nothing to right her wrongs

### B.    Other Factors Do Not Warrant Departing or Varying from the Guidelines

#### 1.  *Majeed*

Majeed asks the Court for a downward variance based on several factors as discussed below.   None of these factors alone or together warrant a variance from a Guidelines sentence.

##### i.  *§ 5K2.12 – Coercion and Duress*

In support of his request for a variance, Majeed argues that he acted out of coercion and duress.   Majeed supports his argument, in part, with a report from Dr. Peter Graham, PhD. However, Dr. Graham's report and opinion appear to be based solely on Majeed's version of events and do not account for opposing statements made by victims and witnesses in this case or Majeed's own contradictory statements.   In fact, Majeed's trial testimony undermines the notion that he acted out of coercion and duress.   During his testimony, Majeed highlighted ways in which he did not follow the rules and challenged people in positions of authority, including Royall and his wives.   For example:

- When Majeed was a lieutenant, he believed that the captain of Louisiana was not treating or dealing with the brothers correctly.   "So [Majeed] spoke to him about it and tried to correct him . . . ."   When the captain told Majeed to keep this quiet, Majeed pushed back and told the captain that Majeed is from Kansas, and he knows how things should be.   When this was reported to Royall, Royall indicated that the captain should have submitted because Majeed knew what he was talking about.   Thus, instead of being disciplined, Majeed was rewarded for breaking rules about

chain of command and challenging the captain by being made national lieutenant. Tr. 4644-45.

- When Majeed had a disagreement with Debra White, Royall's first wife and head of the University, Debra repeatedly attempted to give Majeed orders, which Majeed ignored.   Majeed was then addressed at the "mic" for these transgressions, and Majeed indicted that "[he] wasn't going to back down."   Again, Royall interceded and said, "'Tell Ms. White to leave the boy alone.'   And that's what ended it." Even when Majeed was dispatched thereafter, he was happy with it because "that was the goal anyway."   In fact, he testified that he was disappointed he had not been dispatched sooner.   Tr. 4652-54.

- During a disagreement with a brother about his treatment of a sister, Majeed threatened the brother by telling him he was not going to be able to participate in the business or be a full-time member again because of his interaction with the sister.   Majeed did so knowing that the brother was Royall family and that he was going against protocol and disregarding the rules regarding treatment of the Royall family.   Majeed even testified that he knew what was coming but did it anyway because he did not think it was fair or good for the brother.   And even when this was reported to Royall, Majeed still did not submit or admit wrongdoing.   He doubled down and talked about it to Royall, which only resulted in Royall yelling, "Tell him because I said so."   Tr. 4633-64.

Thus, Majeed did not act under coercion or duress.   In fact, Majeed repeatedly stated that no one was forced to do anything in the Nation.   For example:

- Majeed indicated that while he was told to fast, no one could force him to do it. He testified that "[t]he nation wasn't set up to force anybody."    Tr. 4658.

- Majeed called colonics and the other modalities offered by the nation "a luxury" and indicated that it is unlikely anyone was forced to undergo colonics.    Tr. 4684

- Majeed denied that force was used in the nation and testified that "everybody was happy to do their duty and do it to the best of their ability."    Tr. 4685.

Based on the above, Majeed did not act under coercion or duress.    Majeed did what he thought was best, whether it fit within UNOI's rules or not.    And often he was rewarded for doing so.    Thus, the Court should not vary from the Guidelines based on coercion and duress.

<em>ii.  § 4A1.3 – Criminal History</em>

Majeed also asks this Court to vary because he has no criminal history.    However, U.S.S.G. § 4A1.3 is reserved for defendants whose criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes.    This does not apply to Majeed.

While Majeed has no criminal history, the government has learned of apparent criminal behavior by Majeed that took place after his conviction in this case.    Majeed submitted or caused to be submitted fraudulent mortgage loan applications in his daughters' names to a financial institution.    The loans were for the purpose of selling properties in his name to his daughters.    At least two of these properties are listed in the PSR as Majeed's assets.    PSR ¶ 224.    The loan applications all involved the submission of fraudulent paystubs that were generated by Mr. Paystub.com, which is not a legitimate payroll processing company.    The paystubs falsely

indicated that the defendants' daughters received wages from BioCoffee.    An application submitted in the name of K.M. with a purchase price of $130,000 and a loan in the amount of $104,000 was closed on May 29, 2025.    Applications in the names of T.M. and A.M., for two different properties, both with purchase prices of $130,000, were submitted on July 1, 2025.    The financial institution rejected these applications due to fraud.

Finally, Majeed suggests that another factor the Court should consider in determining whether a variance is appropriate here is that he has been involved in various business ventures, including BioCoffee LLC and owing/managing investment properties with his father. "Employment record is not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.5.    As the Court is aware, BioCoffee was a UNOI business, built on the backs of the victims in this case, and a business that Majeed took with him when UNOI ended.    In fact, Maryam M. testified that Majeed was the person pushing for BioCoffee, and that victims were berated and called slackers and lazy because they did not meet Majeed's sales quota.    Tr. 1471-72.    Majeed also "casually [talked] about how he was going to become a millionaire," which is how Maryam M. learned Majeed was benefitting from BioCoffee sales.    Tr. 1472.    Now Majeed is a millionaire, in part, because of BioCoffee.    This fact should be a reason to give Majeed a Guidelines sentence and not vary from the Guidelines as there is a direct link between Majeed's financial benefit and success and his criminal conduct in this case.    In addition, Majeed's statements to Maryam M. about keeping money for himself should he win the lottery contradict his assertion that he was a true believer of Royall and what UNOI was building.    *See id*.

### 2. *Rassoull*

Rassoull asks the Court to depart and vary from a Guidelines sentence based on several factors. None of those factors alone or together warrant a departure or variance from the Sentencing Guidelines, and the Court should sentence Rassoull to 60 months in prison.

#### i. *§ 5H 1.6 Family Ties and Responsibilities*

Rassoull's family ties do not warrant a departure from a Guidelines sentence. "Family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6; *United States v. Rodriquez-Velarde*, 127 F.3d 966, 968 (10th Cir. 1997) (interpreting Section 5H1.6 "as prohibiting departures from the sentence range in all but extraordinary cases"). "[T]he disintegration of existing family life or relationships . . . is to be expected when a family member engages in criminal activity that results in a period of incarceration." *Rodriguez-Velarde*, 127 F.3d at 968 (quoting *United States v. Canoy*, 38 F.3d 893, 907 (7th Cir. 1997). "Thus, the circuit courts have uniformly held that family circumstances cannot form the basis for a departure unless they are extraordinary." *Id.*; *see, e.g.*, *United States v. Webb*, 49 F.3d 636, 638 (10th Cir. 1995); *Canoy*, 38 F.3d at 906 (collecting cases). "To justify a departure, a defendant must demonstrate that 'the period of incarceration set by the Guidelines would have an effect on the family or family members beyond the disruption to family and parental relationships that would be present in the usual case.'" *Id.* (quoting *Canoy*, 38 F.3d at 907); *see also United States v. Archuleta*, 128 F.3d 1446, 1450 (10th Cir. 1997) (defendant bears burden of "establish[ing] family circumstances so exceptional that they constitute the rare case justifying a departure from the guidelines which already recognize the reality of difficult family circumstances for many defendants and which discourage making an additional allowance on that basis"); *United*

*States v. Webb*, 49 F.3d 636, 638 (10th Cir. 1995) ("[A] district court must identify some extraordinary personal circumstances warranting mitigation in sentencing to justify a departure."); *United States v. Young*, 387 F. App'x 229, 230 (3d Cir. 2010) ("To avoid unfair outcomes, we have held that departures based on familial circumstances should only be granted in extraordinary cases."); *United States v. Haj-Hamed*, 549 F.3d 1020, 1027 (6th Cir. 2008) ("Courts are discouraged from reducing a defendant's sentence based on family circumstances unless those circumstances rise to the level of 'exceptional.'"); *United States v. Tucker*, 386 F.3d 273, 278 (D.C. Cir. 2004) ("As discouraged factors, neither [employment history nor family responsibilities] may be a basis for a departure unless it is present 'to an exceptional degree.'" (citing *Koon v. United States*, 518 U.S. 81, 95–96 (1996)); *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration.").

While Rassoull has not argued that he is a single parent and therefore the only person who can care for his children, his arguments are analogous.    In another case, the Tenth Circuit rejected a defendant's contention that his role as the sole caretaker of his minor son, who began experiencing difficulties in school after the defendant's incarceration, created an unusual family situation that justified a departure.    *See United States v. Webb*, 49 F.3d 636, 638-39 (10th Cir. 1995).    Other circuits have also held that a defendant's status as a single parent does not constitute an extraordinary family circumstance warranting departure.    *See, e.g.*, *United States v. Chestna*, 962 F.2d 103, 107 (1st Cir. 1992) (single mother of four young children, including infant born after sentencing); *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991) (single mother of five children, ranging in age from eleven months to eleven years); *United*

*States v. Goff*, 907 F.2d 1441, 1446 (4th Cir. 1990) (single mother of three children, aged seven, six, and two, who would have to live with ill grandmother in another state during mother's incarceration); *Brand*, 907 F.2d at 32-33 (sole custodial parent of two children, aged seven and eighteen months, younger of which would live with grandmother and older of which would live with foster parents in another state); *United States v. Harrison*, 970 F.2d 444, 447-48 (8th Cir. 1992) (widow with adopted granddaughter, aged nine, who would have to live with mother whom defendant alleged was not competent to care for child because of " 'her drinking and carousing around and dope' "); *Dyce*, 91 F.3d at 1467 (single mother of three young children, including infant who was being breast-fed).

Further, Tenth Circuit case law indicates a downward departure for family circumstances is warranted where the "defendant [is] the *only* individual able to provide the assistance a family member needs." *United States v. McClatchey*, 316, F.3d 1122, 1131 (10th Cir. 2003) (emphasis added) (holding that a defendant's family circumstances were not exceptional despite the fact that defendant's 22 year-old son had severe psychological disorders, requiring constant care and precluding defendant's spouse from working outside the home).   Other courts provide similar guidance.   *See United States v. Pereira*, 272 F.3d 76, 83 (1st Cir. 2001) ("As long as there are feasible alternatives of care that are relatively comparable to what the defendant provides, the defendant cannot be irreplaceable."); *United States v. Sweeting*, 213 F.3d 95, 108-09 (3rd. Cir. 2002) (downward departure inappropriate for defendant whose son suffered from Tourette's Syndrome where evidence did not indicate defendant was only person who could care for son); *United States v. Allen*, 87 F.3d 1224, 1226 n.2 (11th Cir. 1996) (downward departure

unwarranted where defendant's husband and adult son were able to help care for father who suffered from Alzheimer's and Parkinson's diseases).

As is clear from Rassoull's sentencing memorandum, while he argues that he is the best person to take care of his daughter, he is not the only option.    Even if the Court agrees that the care Rassoull provides his daughter cannot be replicated by others, that is not the analysis.    The question for the Court is whether there are alternative options for the care of the child.    Indeed, Rassoull's own memorandum indicates there are.    Thus, Rassoull cannot meet his burden to establish extraordinary circumstances warranting an exception to the Guidelines' general policy statement that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."    U.S.S.G. § 5H1.6.

In support of Rassoull's request for a departure based on family ties and responsibilities, he cites three cases outside the Tenth Circuit, all involving defendants who pled guilty to non-violent drug and financial offenses.    Those cases are distinguishable.

In *United States v. Bueno*, an expert witness indicated that the defendant's wife suffered from a life-threatening condition where she has seizures, loses consciousness, becomes incontinent, and needs somebody with her all the time.    549 F.3d 1176, 1178-79 (8th Cir. 2008). A second expert indicated that she suffered from major depressive disorder, suicidal ideation, panic disorder, all of which were life threatening.    *Id.*    The district court then held that the defendant's wife "was in fact suffering from life threatening diseases and maladies and that [the defendant] was the only person who could provide the continual care that she required," thus a departure was warranted.    *Id.* at 1179-80.    The Eighth Circuit held that such a departure was not unreasonable. *Id.* at 1180.

13

In *United States v. Leon*, the district court departed downward based on the defendant's extraordinary family circumstances.    341 F.3d 928, 932 (9th Cir. 2003).    In reaching its decision, the district court placed special emphasis on the defendant's wife's poor emotional and physical health and the fact that Leon was the *only* person available to tend to her needs.    *Id.*    The district court reviewed a psychologist's report, which indicated that the defendant's wife would be at risk of committing suicide if she were to lose her husband due to death or incarceration.    *Id.*    Further, the court noted that other family members were deceased or otherwise unavailable, and that the defendant was his wife's sole support, which the court deemed important in light of her recent surgery to remove her cancerous kidney and the possibility of having cancer in her other kidney. *Id.*    Given these facts, the Ninth Circuit held that the district court did not err in its decision to depart based on extraordinary family circumstances.    *Id*.

Finally, in *United States v. Colp*, the district court departed downward based on the defendant's exceptional family ties and responsibilities.    249 F. Supp. 2d 740, 743 (E.D. Va. 2003).    There, the district court relied on an expert report to find that the defendant's husband suffered from traumatic brain injury which led to serious complications, including depression, cognitive defects, seizure disorder, incontinence, urinary complications, knee pain, shoulder pain, and sleep disturbance.    *Id.*    Further, the court found that the defendant was the sole caretaker for her disabled husband who had very limited functioning capabilities and that he had no other family in the area who could provide adequate nursing care.    *Id.*    Thus, the court determined that the case presented "unique and extraordinary circumstances," and as such a departure was warranted. *Id.*

14

Here, there are no such unique and extraordinary family circumstances.   First, Rassoull's own memorandum illustrates that there are other family members who can care for his child. Whether someone is best suited for primary custody or to properly provide for the child is not a question before this Court.   That question is for another court on another day.   The inquiry here is whether Rassoull is the *only* individual able to provide the assistance a family member needs. *See McClatchey*, 316 F.3d at 1131 (10th Cir. 2003).   Based on the relevant caselaw, the answer is no.   Second, Rassoull's child does not suffer from severe or life-threatening conditions such as those found in cases where courts have found the family circumstances extraordinary.   "[T]he Guidelines are clear that in this most difficult and justifiably sympathy-evoking area, courts should depart downward only in rare cases."   *Archuleta*, 128 F.3d at 1452.   This is not one of those cases, and therefore, the Court should not depart based on family ties and circumstances alone or in combination with other factors.

### ii.   *§ 5H1.1 – Youthful*

Rassoull alleges that he was youthful during the entirety of the conspiracy.   He argues that his history of growing up in the cult and not being exposed to any other belief system should be considered by the Court in determining whether to depart based on his youthfulness.   However, Rassoull's own testimony refutes this assertion.   Rassoull testified that starting at age 14 when he was made minister, he would sneak and read something that would give him context to Royall's teachings.   Tr. 4317-18.   Because he knew nothing about Christianity or Judaism, he would go to the library and sneak books so he would understand what he was talking about when he was interacting with someone who was of another religion.   Tr. 4318.   He continued this practice throughout his time as a minister, even though Royall discouraged reading books that were not

sanctioned or did not relate to something Royall taught.    *Id.* at 4341-42.    Further, unlike regular full-time members, Rassoull held a job outside UNOI, and as such, he had the opportunity to learn about and participate in a world outside of UNOI.    Tr. 4368-69; 4535-36.    Finally, at 26 years old, Rassoull was no longer youthful.    *See Contreras*, 180 F.3d at 1212.

### iii.    § 4A1.3 – Criminal History

While Rassoull has no criminal history, this crime was ongoing for more than twelve years. Further, a downward departure pursuant to U.S.S.G. § 4A1.3(b)(1) is reserved for defendants whose "criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."    This does not apply to Rassoull.

### iv.    § 5H1.5 – Employment Record

"Employment record is not ordinarily relevant in determining whether a departure is warranted."    U.S.S.G. § 5H1.5.    Thus, the Court should not depart based on Rassoull's employment record.    Indeed, Rassoull's ability to quickly secure and keep gainful employments shows that he was differently situated than the victims.

### v.    § 5H1.12 – Lack of Guidance as a Youth

"Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted."    U.S.S.G. § 5H1.12.    The Court should not depart based on Rassoull's alleged lack of guidance as a youth. The evidence at trial showed that Rassoull was treated differently than the other youth in UNOI. He was promoted to positions of authority beginning at 14 years old and based on his unique

position as minister and National Minister, Rassoull was able to enrich himself by reading and learning about other religions and life outside of UNOI.

vi.  *§ 5K2.16 – Voluntary Disclosure of Offense*

Rassoull contends that departure is warranted under U.S.S.G § 5K2.16, which states, "If the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a downward departure may be warranted."    Even viewing the evidence as Rassoull argues it, he never *voluntarily* disclosed the existence of the forced labor conspiracy.    In fact, he has repeatedly denied any such conspiracy existed or that forced labor occurred.    Further, Rassoull has failed to accept any responsibility for his part in the conspiracy that caused significant trauma to the victims.    To the contrary, he has attempted to portray himself as a victim.

None of Rassoull's suggested reasons for departure alone or when considered together warrant departure from a Guidelines sentence; thus, the Court should sentence Rassoull to 60 months in prison.

3.  <u>Staton</u>

Staton asks the Court for a downward variance based on several factors, including what he labels "remorse."    But his memorandum more accurately describes feelings of regret—regret for how his decisions impacted his own family.    Indeed, his ex-wife, who testified on his behalf at trial, submitted a letter, stating "that he regrets allowing his family to be broken up."    Staton also claims to hold "deep remorse and regret regarding his time in UNOI, his family's involvement, and the impact it had on them."    These sentiments fall short of the kind of remorse that warrants consideration from the Court.    Staton does not show remorse for how his actions and his

17

involvement in the conspiracy to commit forced labor impacted the victims.    He played a key role in breaking up their families.    He created the Laborers' Guide and the UNOI Instructor Manual; and in doing so he helped create the coercive environment that kept the victims trapped in UNOI for years.    The furthest Staton goes towards showing any remorse to the victims is to "recognize[] that everyone suffered, in various degrees."    That simply is not enough.

Additionally, Staton downplays his role in the conspiracy and places the blame on others. He claims that his "role in the Nation did not put him in direct contact with youth members," and that he did not learn that youth members were working in businesses instead of going to school until his own children told him years later.    The notion that someone in Staton's position, who oversaw the secretarial department and codified the organization's coercive practices, was unaware of the practice of staffing businesses with children defies common sense.    His role leading math class alone gave him a front-row seat to the public airing of youth members' transgressions, which often included transgressions that took place at the businesses.

The government also takes issue with Staton's claim that he was not violent.    It is true that some defendants were more violent than Staton, but Staton is not without blame.    He paddled Devon Y. and withheld Niesha K.'s inhaler and locked her in his attic.    Moreover, Staton presided over math class, which was inherently coercive and violent, and involved punishing children by sometimes administering beatings or issuing punishments that included fasting and public shaming.    Staton claims that he did not intend harm—physical or psychological—but the jury disagreed.    The jury found that Staton had the requisite intent to commit forced labor against the children of UNOI, and he should be held accountable.

18

Staton also asks the Court to vary from a Guidelines sentence based on his family ties and responsibilities. However, Staton's family circumstances are similar to every defendant faced with imprisonment. While he argues that he is in the best position to help care for his ailing mother, he is not the only available person to do so as contemplated by the Guidelines and relevant caselaw as discussed more fully above. Further, Staton's mother is not suffering from such unique and life-threatening illnesses to make these circumstances extraordinary. Thus, the Court should not vary from the Guidelines based on Staton's family ties.

Staton submitted letters from family members, including his children, commenting on how great of a father he was. These letters, of course, do not address how Staton treated other youth members of UNOI. Shakira M. testified that when she was 14 or 15 years old, she and another youth member worked as full-time maids at Staton's house, cooking for and cleaning up after Staton and his family day and night. Tr. 2638. Shakira testified that Staton and his wife treated her like a "servant" and that they made "no eye contact" and summoned her using an intercom. Tr. 2639. Shakira further testified that she was not treated equally or like she was part of the family, while Staton and his wife were loving to their children and gave them whatever they wanted. Tr. 2639-40. The letters that Staton submitted to the Court included one from his son, Jason. The government asks the Court to examine Jason's letter with great caution. In his letter, Jason told the Court that his father's intentions and personal conduct were "good"; that he never saw his father abuse anyone in any "shape, form, or fashion"; and that his father's "spirituality and character is what caused us to be the same peaceful, nonviolent people who simply want to laugh and enjoy life too." This, of course, is the same Jason Staton who was an unindicted co-conspirator in this case and whose name was repeatedly mentioned throughout the trial. Jason

19

was also known as "the Universe."    In that role, which he held in the later years of UNOI, he sat as a member of the board and conducted "clearings."    Jason was actively involved in running and growing UNOI during the later years when, according to his letter, his father "left the Nation without two dimes to rub together."    Witnesses testified, among other things, that Jason: instructed youth members to lie to officials who visited UNOI restaurants, *see* Tr. 1059; ordered a 12-year-old youth member to receive 54 colonics in a year because she was "full of shit," *see* Tr. 1475; and conducted a clearing on a 9-year-old youth member, called her a "child of Satan," and said she tried to kill her father, causing her family to disown her and send her to a mental institution, *see* Tr. 1769.    The Court should sentence Staton to a term of 60 months' imprisonment consistent with the Guidelines.

### 4. *Hadley*

Hadley separately asks for a downward departure based on diminished capacity.    U.S.S.G. § 5K2.13 provides: "A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense.    Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense. Section 5K2.13 does not apply to Hadley or any other defendant.    Hadley told Probation that "he has never been diagnosed with a mental health disorder."    Hadley PSR ¶ 182.    Nothing in the record suggests that Hadley suffered from a significantly reduced mental capacity when he committed the offense.    Moreover, § 5K2.13 precludes the Court from departing below the applicable Guidelines range based on diminished capacity because the offense involved actual

20

violence or a serious threat of violence. *See id.* Multiple witnesses testified that Hadley committed serious acts of physical violence against them when they were children. Therefore, the Court should not depart based on diminished capacity.

It is also worth noting Hadley's complete reversal since trial. Like the other defendants, Hadley now claims he was the victim of a "coercive, theocratic regime, where dissent was unthinkable, disobedience was spiritual suicide, and questioning Royall's authority was equated with rebellion against God." This is in stark contrast to his arguments at trial that the government's witnesses were liars and that, if anything, he created a "climate of fun." Why Hadley has changed his position is obvious—now that the jury has found him guilty, he believes it is now in his interest to claim that he, too, was coerced. Hadley misses the bigger picture here, which is that he was a grown man who conspired with others to commit forced labor against defenseless children, and part of his role included beating those children. He could have left the organization. He had options. He could have said no. But he chose to stay. He chose to engage in physical abuse so bad that his victims believed he enjoyed it.

The government also objects to Hadley's request for a variance to allow him to "maintain lawful employment and begin making meaningful restitution to the victims." All of the defendants, including Hadley, should pay restitution to the victims, but that will not make the victims whole. Nothing will return the childhoods that Hadley and the other defendants stole from the victims. The Guidelines prison sentence is just one step towards justice for the victims. In support of Hadley's request for a variance based on ability to pay restitution, he cites three cases outside the Tenth Circuit, all involving defendants who pled guilty to non-violent fraud offenses. In those cases, the defendants' Guidelines ranges of imprisonment were 21-17 months, 12-18

months, and 12-18 months, respectively.    *See United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006); *United States v. Peterson*, 363 F. Supp. 2d 1060 (E.D. Wis. 2005) (Adelman, J.); *United States v. Allen*, No. 08-CR-154, 2008 WL 5101690 (E.D. Wis. Dec. 1, 2008) (Adelman, J.). Hadley, on the other hand, has a Guidelines range of imprisonment of 60 months, which would have been 360-life but for the statutory maximum.    Hadley is also distinguishable from the defendants in *Menyweather*, *Peterson*, and *Allen*, because he was convicted of an offense in which he committed brutal acts of violence against children.    Moreover, the PSR notes that Hadley "has a net worth in excess of $1.3 million," *see* Hadley PSR ¶ 190, and earns $5,287.50 in monthly rental income, *see* Hadley PSR ¶ 188, which Hadley can readily access to satisfy a restitution order. A sentence of incarceration certainly would not "completely foreclose the possibility of meaningful restitution by Mr. Hadley," as he claims in his sentencing memorandum.

Finally, it is important to note that while Hadley's sentencing memorandum states that he "[r]esigned voluntarily from his high-ranking position once charged, in an act of accountability and respect for the process," his PSR states that he "had to resign this job in 2021 due to the current charges as he did not pass security clearance."    Hadley PSR ¶ 186.    The Court should sentence Hadley to a term of 60 months' imprisonment consistent with the Guidelines.

### 5. *Peach*

Contrary to what Peach claims in her sentencing memorandum, at no point in this process has Peach shown remorse for what she did.    Indeed, she has done the opposite.    In 2019, Peach lied under oath to help Royall avoid paying a civil judgment to Kendra R.    And contrary to Peach's claim that she "voluntarily disengage[ed] from criminal conduct and reent[ered] into society," she herself admits that she was not the one who decided to leave.    In her own words,

22

she was "expelled from the Royall Family."   Whether her expulsion from the Royall Family created later hardships for Peach, or whether Royall duped her too, is beside the point.   She did not leave on her own.   And Peach's failure to take any affirmative steps to right her wrongs carried on well past the end of the conspiracy when she followed Royall into another version of UNOI. At trial, Peach joined other defendants in arguing that the victims exaggerated their experience and that life in UNOI was all well and good.   Now that she has been convicted, she claims she is a victim, too.   The bottom line is that Peach held an important position in a forced labor conspiracy that stole the childhoods of countless children.   Peach did not show remorse for her actions when she was expelled from UNOI, she did not show remorse when she obstructed Kendra R. from collecting on her civil judgment, and she does not show remorse now.   The Court should sentence Peach to a term of 60 months' imprisonment consistent with the Guidelines.

## C.    Sentencing Disparities

Defendants Majeed, Rassoull, Staton, and Hadley ask this court to consider sentencing disparities among co-defendants when determining an appropriate sentence.

The defendants are mistaken about the type of disparities that the Court has to consider. The law is not designed "to eliminate disparities among co-defendants but rather eliminate disparities among sentences nationwide."   *United States v. Pena*, 963 F.3d 1016, 1026 (10th Cir. 2020) (quoting *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008)).   Thus, courts may, but need not, also consider the sentences of co-defendants.   *See Zapata*, 546 F.3d at 1194 ("A district court may consider sentencing disparities between co-defendants."); *United States v. Verdin-Garcia*, 516 F.3d 884, 889 (10th Cir. 2008) ("[Section] 3553(a)(6) requires a judge to take into account only disparities *nationwide* among defendants with similar records and Guideline

23

calculations."). "18 U.S.C. § 3553(a)(6)'s consideration of unwarranted sentence disparities is but one factor that a district court must balance against the other § 3553(a) factors in arriving at an appropriate sentence." *Id.* (quoting *United States v. Martinez*, 610 F.3d 1216, 1228 (10th Cir. 2010)). Here, any difference in sentence between co-defendants does not involve a national disparity, so any potential difference alone is insufficient for the court to depart or vary from a Guidelines sentence.

Moreover, Majeed, unlike his co-defendants, was convicted of substantive forced labor charges triggering a higher statutory maximum. Thus, any disparity among co-defendants is warranted and explained by the jury's verdict holding Majeed responsible for substantive counts of forced labor. The twelve members of the jury should be trusted to discern between the individual defendants' conduct, and the Court should sentence Majeed consistent with their verdict.

## II. The Court Should Impose Restitution as Requested by the Government

Defendants argue that restitution as requested by the government is not proper and the Court should not order restitution as calculated in accordance with 18 U.S.C. § 1593. The government relies on its arguments in its sentencing memorandum and further responds to each of the defendants' arguments in turn.

Defendant's Majeed and Rassoull argue that the Court cannot order restitution to victims who left UNOI and "voluntarily" returned. Any victims who returned to UNOI, whether it was after being kicked out of the organization by leadership (like Kendra R.) or whether they left and returned because of the defendants' coercive scheme (like Devon Y.), did not return "voluntarily." The coercive scheme used by the defendants and their co-conspirators was such that the fear of serious harm continued even after being away from UNOI. Thus, returning to UNOI was

24

compelled by the defendants' coercive scheme and was not a voluntary act on the part of any victim.    Therefore, any return to UNOI was not "voluntary" as contemplated by caselaw.

Indeed, cases cited by Rassoull (Majeed cites no authority) relate to a restitution order under the Mandatory Victims Restitution Act (MVRA) and are either not relevant here or are otherwise dissimilar.    *See United States v. Speakman*, 594 F.3d 1165 (10th Cir. 2010).    However, even if the government was required to show that there was no intervening cause of the loss suffered by the victims as discussed in *Speakman*, evidence that Rassoull was still in a position of authority, part of running UNOI, and part of the ongoing conspiracy when any victim returned to UNOI shows that there was no such intervening cause.    *Id*.    And even if there was an intervening cause, the intervening cause was directly related to the offense conduct in this case as argued above regarding the role of the defendants' coercive scheme in any return to UNOI.    Further, "a defendant convicted of a conspiracy offense is liable in restitution for all losses that proximately result from the conspiracy itself, including losses attributable to coconspirators."    *United States v. Anthony*, 22, F.4th 942, 950 (10th Cir. 2022).    Thus, Rassoull and Majeed are liable for all losses that proximately resulted from the conspiracy itself and losses attributable to coconspirators.

Defendant Rassoull also argues that the Court cannot order restitution to any victim who was an official during their time in UNOI because they were "participants" as contemplated by Section 3663.    While Rassoull may want to paint the victims as "participants" simply because they may have been given a title, the evidence at trial and submitted to the Court for sentencing proves they were not "participants" of the criminal conspiracy to commit forced labor.    Indeed, they are "person[s] directly and proximately harmed as a result of the commission of an offense . . . ."    18 U.S.C. § 3663(a)(2).

Finally, as to Majeed, liquidated damages are not discretionary, contrary to what Majeed argues without authority. They are mandatory. "'[T]he value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the [Fair Labor Standards Act]' includes liquidated damages . . . ." 18 U.S.C § 1593(b)(3); *United States v. Edwards*, 995 F.3d 342 (4th Cir. 2021).

## III.    <u>Conclusion</u>

For reasons stated in the government's sentencing memorandum, its responses to the defendants' PSR objections, and this response, the government respectfully submits that Guidelines sentences, as calculated in the PSRs, are warranted in this case. With respect to defendant Majeed, the government will make a specific recommendation for a term of imprisonment at the sentencing hearing.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
UNITED STATES ATTORNEY

By: */s/ Ryan J. Huschka*
Ryan J. Huschka
Assistant United States Attorney
United States Attorney's Office for the
District of Kansas
500 State Avenue, Suite 360
Kansas City, KS 66101
Phone:  913-551-6730
Fax:  913-551-6754
Email:  Ryan.Huschka@usdoj.gov
KS Bar No. 23840

HARMEET K. DHILLON
ASSISTANT ATTORNEY GENERAL

By: */s/ Kate A. Alexander*
Kate A. Alexander
Trial Attorney
USDOJ Human Trafficking Prosecution Unit
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:   202-532-3373
Email:   Kate.Alexander@usdoj.gov
FL Bar No. 27393

By: */s/ Francisco Zornosa*
Francisco Zornosa
Trial Attorney
USDOJ Human Trafficking Prosecution Unit
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:   202-616-4588
Email:   Francisco.Zornosa@usdoj.gov
NY Bar No. 5477245

27

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 28, 2025, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record in the above-captioned case.

*/s/ Ryan J. Huschka*
RYAN J. HUSCHKA
Assistant United States Attorney
